New Orleans, Jackson, and Great Northern Railroad Company *v.* John B. Statham.

1. COMMON CARRIERS: EXEMPLARY DAMAGES.— To warrant a jury in finding exemplary damages, either malice, violence, fraud, or oppression must be shown to have mingled in the wrongful act complained of.
2. SAME: RAILROADS: DUTIES OF CONDUCTOR AND PASSENGER.— If a passenger is sick, unable to walk, and require assistance to get from the car, and longer delay at the station is necessary for him to be safely removed, he should give timely notice of the same to the conductor.
3. SAME: SAME.— Sick persons, and persons unable to take care of themselves, should provide for themselves proper assistance while travelling in railroad cars; it is not the duty of railroad companies to supply it.
4. SAME: SAME.— It is not the duty of conductors to see to the debarkation of passengers; they should have the stations announced, and stop long enough for passengers to get off.
5. SAME: RAILROADS: STATUTE FOR PROTECTION OF PASSENGERS. — The statute (Rev. Code, 299) for the protection of railroad passengers is intended to hold railroad companies responsible for *actual, not punitive* or *exemplary*

damages. Gross negligence must be shown to authorize the jury to exceed actual damages sustained.

6. INSTRUCTIONS TO JURY: ERRONEOUS WHEN THEY PARTIALLY AND IMPERFECTLY STATE FACTS, ETC.— It is erroneous for courts to give instructions containing only a portion of the material facts connected with any particular transaction, and omitting others of equal importance, and which, if included in the instruction, lead the mind of the jury to a different conclusion.

7. CORPORATIONS, STOCKHOLDERS ENTITLED TO PROTECTION OF THE COURTS.— Proper and reasonable safeguards should be thrown around the rights of corporations by the courts, when the interests of innocent stockholders are at issue, and particularly when their pecuniary interest is to suffer by the acts of their employes.

8. HIGH COURT: WILL DISTURB VERDICT, WHEN.— The High Court will not disturb a verdict for damages when it is not apparent that the jury misapplied the law or misunderstood the facts, or had been influenced by their prejudices or passions, rather than by an observance of the law and facts of the case.

ERROR to the Circuit Court of Hinds county. Hon. John Watts, judge.

*Jno. D. Freeman* for plaintiff in error.

The finding of the verdict was clearly unsupported by the evidence and the law.

Statham was not carried beyond Terry station, which was his destination. The cars remained at the platform the usual length of time. The conductor did not know of Statham's illness; he made no effort to get off the cars, nor did he call the conductor.

The conductor put him off as soon as called upon, and put him off just in the manner he requested, at the other end of the car he was on. He did not request the conductor to back the train. The conductor could have done no more than he did, and discharged his duty promptly.

The Company cannot be held responsible for injuries to a passenger that would not have happened but for the passenger's own negligence, or where, by such negligence, he substantially contributes to the injuries received, notwithstanding the Company would be chargeable with a breach of duty; nor is a Company responsible for injuries if the injured party

New Orleans, Jackson, and Great Northern Railroad Co. *v.* John B. Statham.

brought them about by a breach of its reasonable regulations. Pierce on Railroad Laws, pp. 475–6; *Southern Railroad Company* v. *Kendrick*, 40 Miss. 384. It is *not* the duty of the road to see that passengers or their baggage are put off at their destination. 31 Miss. 192.

*A. G. Brown* and *T. J. & F. A. R. Wharton*, for defendant in error.

The only plea was "not guilty," and the case was tried simply on its merits: there was no demurrer. Then if the instructions of the court were correct, the verdict cannot be disturbed.

The instructions were elaborately argued in the respective briefs of counsel; in support of those of the plaintiff below the following authorities are cited: *McCaughan* v. *Heirn*, 32 Miss. 7; 36 ib. 666; Rev. Code, art. 43, 299; 40 Miss. 386; 32 Penn. 296.

It is a well-established rule of law, that when the verdict is correct, and satisfies the conscience of the court, it should not be set aside because erroneous instructions were given.

A verdict will not be set aside, unless opposed by the decided preponderance of evidence. 13 S. & M. 202.

The jury are the judges of the weight of evidence, and they found their verdict upon the whole evidence in this case, and it should not be disturbed.

SHACKELFORD, C.J., delivered the opinion of the court.

This is an action of "trespass upon the case," instituted by the defendant in error in the First District Circuit Court of Hinds county, against plaintiff in error.

It is alleged in the declaration, that on the 17th day of January, 1867, Statham purchased a ticket for Terry station on said road, and entered the cars of said road, the train going south; that he was carried by the said Company's engine beyond the platform of said station, and placed on the ground by said Company's conductor.

That the train upon which he was a passenger that day did

39

.not stop a half-minute at said platform at Terry; that he was sick at the time, and that the conductor knew it, and that he was unable to attend to himself; and that the conductor, Joseph H. Smith, persistently and insultingly refused to detain the train at the platform aforesaid the usual time for discharging passengers, or long enough for the friends of Statham to remove him from the train; that he had to get off the train on the ground, and then was carried back " from where he got off to the station-house."

That when the conductor was appealed to by the friends of Statham and the bystanders to back to the platform to enable Statham to get off, Smith profanely and blasphemously said " he would not back the train for Jesus Christ."

It concludes : " For these wrongs and injuries he demands ten thousand dollars damages."

The plea of not guilty was filed to this declaration.

Jury and verdict for defendant in error for $3275, and judgment thereon against plaintiff in error.

A motion was made by plaintiffs in error for a new trial, which was overruled by the court.

To the ruling of the court in refusing the new trial the plaintiff in error excepted.

The bill of exceptions embraces the motion for a new trial; also all the testimony before the jury at the trial, and the instructions of the court given, and those refused and modified.

The case is here by writ of error for revisal.

There are five assignments of error. The disposition of the questions raised on the motion for a new trial, and made here the grounds for the first assignment of error, will settle all the points presented for our consideration in the four other assignments of error, which are mere repetitions of the grounds for a new trial.

No special or pecuniary damage was sustained by the defendant in error by the act complained of in his declaration. No attempt was made on the trial to prove that he received any injury to his health or person, or that he sustained the least pe-

cuniary loss by his getting off the car at the point he reached the ground.

Therefore it must be conceded by the defendant in error that the verdict in this case was for exemplary or punitive damages.

To warrant a jury in finding a verdict for exemplary or punitive damages, either malice, violence, fraud, or oppression must be shown to have mingled in the acts complained of. Sedgwick on Damages.

Testing the case under consideration by this rule, we shall determine, first, whether " the verdict was against the law and the evidence " —this being the first ground insisted upon on the trial of the motion for a new trial.

To arrive at a correct conclusion upon this point, we shall necessarily be compelled to bring into view much of the testimony.

We are unable to perceive, after an examination of the record, any act of the conductor, Joseph H. Smith, towards the defendant in error, which savors of rudeness, violence, malice, fraud, or oppression.

Dr. Thompson, the principal witness for the defendant in error, states that he called the attention of the man he supposed to be the conductor, to Mr. Statham, when he called upon him for his ticket, and said " he was very sick; that he was to get out at Terry ; " that " *his reason for doing so* (as he supposed he was the conductor) was, that he *might* stop the cars at Terry station long enough for Statham to be taken out of the cars."

It will be observed that this witness did not inform the conductor that he wished him to delay the train longer than usual. He did not inform him that Mr. Statham needed assistance in getting out of the cars, or that he wanted the conductor, or the employees of the company, to assist him in getting out of the car.

Neither did his friend Lenoir make any such request. The defendant in error made no statement to the conductor that he needed assistance to enable him to leave the train, or that he

desired him to assist him.   He failed to give the conductor the least intimation that he was unable to get out of the car without assistance.

.   There was no proof at the trial that Mr. Statham was speech-less on the occasion.

It seems clear that the friends of Statham, as well as Statham himself, neglected to make such statements to the conductor as should require him to pursue any other course, other than the usual routine of business, when he reached Terry station.

Thompson and Lenoir, as shown by the testimony of Thompson, carried Statham from the hotel in Jackson to the hack which transported him to the depot in Jackson.

Could they not have done the same thing at Terry station?

There is no reason given why it was not done; Lenoir and Thompson were to get off at Terry.

Thompson shows conclusively that there was no attempt made by any one to help Statham from the cars on the arrival of the train at the station.

Thompson says he stationed himself at the door, and "*jumped off* to hunt assistance," and met Mr. Seal, and in-formed him that Mr. Statham was in the car, and pointed to the one he was in, and turned to find other assistance; that he was looking for other assistance, and the cars passed on be-fore he found any."

It is not shown by the testimony of Statham, or any of his witnesses, that he could not walk with assistance.

The contrary appears from the proof: it is shown, and not denied by Statham, that, with the assistance of Lenoir and Seal, Statham walked out of the car on to the platform of the car, and from thence walked down the steps of the car to the ground; and was then immediately placed in a chair procured before from the station-house, and from thence carried all the way to the station-house, across the platform of the station.

Statham appeared on the platform of the car most distant from the platform of the station.   It was just as easy for him to have walked to the end of the car he was in, which was

shown by the testimony to have been within six or eight feet from the station platform, as it was for him to go where he presented himself for debarkation.

Having gotten to the end of the car farthest from the station platform and the ladies' car, there certainly could be no impediment in the way to the ladies' car. At all events, none was shown at the trial. If he had gone into the ladies' car, he could have gotten from it to the station platform.

By his not taking this course, his action and that of his friends must be considered in this particular as voluntary, and done from their own choice.

Suppose Statham had gotten off on the platform of the station on the arrival of the train, would he not have been placed in a chair, to be carried to the station-house? If so, in what particular was he injured by being placed in a chair sixty feet from the platform, and carried all the way to the station-house? If he could walk on the platform, why did he not walk after he reached it? It would seem from this testimony that the course pursued towards him, after getting out of the cars, was the same that would have been done had he gotten out on the platform. Consequently, not the least discomfort or injury to him has been shown by his being carried the length of a car beyond the station platform.

The testimony of Statham shows conclusively that he did not make the necessary exertions to get off the cars at Terry, when the train stopped, that he should have done.

He states that "he made an exertion to rise from his seat, but he found he could not stand without assistance; that he expected to be taken off the cars, *but did not ask any one to take him off*. That he made no effort to get out, nor did he call the conductor to help him out." Thompson had left him and Lenoir did not offer to assist him.

Railroad cars are not travelling hospitals, nor their employees nurses.

Sick persons have the right to enter the cars of a railroad company; as common carriers of passengers, they cannot prevent their entering their cars.

If they are incapable of taking care of themselves, they should have attendants along to care for them, or to render them such assistance as they may require in the cars; and to assist them from the cars at the point of their destination.

It is not the duty of conductors to see to the debarkation of passengers.

They should have the stations announced; they should stop the train sufficiently long for the passengers for each station to get off. When this is done, their duty to the passengers is performed.

All assistance that a conductor may extend to ladies without escorts, or with children, or to persons who are sick, and ask his assistance in getting on and off trains, is purely a matter of courtesy, and not at all incumbent upon him in the line of his public duty.

It is a well-settled rule of law, that a party in an action on the case for negligence cannot recover damages which have resulted from his own negligence and want of care.

He must show himself in the right, and the defendant in the wrong; that he has performed his duties, and that the defendant has neglected his; and the damages are a legitimate consequence of the negligence of the defendant. 3 Barb. S. Court Rep. 249; 3 La. Ann. Rep. 48; 8 Barb. S. C. Rep. 427; 3 La. Ann. Rep. 441; 19 Wendall, 399, and cases cited therein; 46 Penn. 316; *Chicago and Burlington Railroad Company* v. *Denny*, 26 Ill. Rep. 255; 26 ib. 373; 22 ib. 633; 9 Wisconsin Rep. 202; 1 Broome (N. J.), 188; 34 Mo. 55; 15 Wisconsin Rep. 598; 46 Barb. 264.

The course pursued by the defendant in error and his friends, on the arrival of the train at Terry, as developed by the testimony of Statham and his witnesses, brings his case within the operation of the principles just stated.

The conductor had a right to suppose the defendant in error, as well as all the other passengers for that station, had gotten off the train when he started it. He states that he had gone from his baggage car to the ladies' car after the train had stopped, and assisted two ladies from the car to the platform.

Counsel for defendant in error contend that Statham had not time to get off; and rely upon the testimony of Seal and Thompson to prove that the train did not stop "a second of time; if it did (says Seal), he was not aware of it."

When the cars, or train, stopped the second time (it having moved two hundred or a hundred and fifty feet), Statham was at the platform, where he left the train; it would necessarily have taken Seal and the defendant in error more than a "second of time" to have gotten from the inside of the car to the platform of the same, as Seal had to enter the car and assist Statham to the platform. Statham was on the platform when the conductor was requested to stop the train.

If we are right in this view of the transaction, this witness was deceived as to the time the train first remained at the station.

Joseph H. Smith, the conductor, and James M. Childs, the station agent, state facts, the performance of which could not have been done in less time than from a minute and a half to two minutes — the usual time of stopping at stations.

The statements of Seal and Thompson relative to the time the train remained at the station the first time it stopped, are *mere impressions,* and the jury should have so considered them.

The conductor, Smith, and Childs, the agent, from their business and their positions at the time, would certainly have a more correct recollection of the time the train remained before starting than persons unconnected with the railroad company. These witnesses are disinterested, and their testimony stands unimpeached.

The jury had a right to disbelieve their testimony, and to consider their positive statements of what they did on the occasion before the train was started, as well as their statements as to the time consumed in the performance of the acts stated by them, and to believe the *impressions* of other witnesses to be conclusive against the presumption of their truth; but it seems to us that the weight of testimony in this particular was manifestly with the plaintiff in error.

Corroborative of this view of the testimony just referred to, it was admitted and sworn by the defendant in error that the train stopped at Byram's station the usual time—the station just above or north of Terry: the presumption is irresistible, that the train stopped at Terry the usual time, for the conductor, Smith, could have had no motive to induce him to pass Terry without stopping sufficiently long for his passengers to get off there, as he had five for that point. He was as much behind time at Byram's as at Terry.

The rights of well passengers must be consulted and respected as well as those of sick passengers, by the employees of railroad companies in the discharge of their public duties.

The impression to be gathered from the argument of counsel for defendant in error, relative to this branch of the cause, is, that the conductors of railroad trains, with a sufficient number of employees of the company, should go through the cars at every station to see whether there any sick passengers to get off, and if so, that it is their duty to assist them off the train; and if this is not done, that any person, unconnected with the company, has a right to stop the train and have it backed to the station, in case it should be discovered that there are sick passengers who have not gotten off at the last station passed.

To give the least sanction to such a position or assumption would produce incalculable mischief.

The rights of the travelling public would be irremediably entrenched upon; unusual delays would be the necessary consequence; danger of collisions, jeopardizing the lives of passengers, would be imminent. The missing of connections would necessarily follow by such delays.

Speed and safety are dependent upon a strict adherence to their schedule time. If these assumed rights were recognized, the whole management of the railroad trains would be subordinate to the commands and demands of outsiders, and the caprices of sick passengers and their friends.

It is insisted by counsel for defendant in error, that the verdict should not be disturbed, because the conductor, Smith, did not back the train when he was called on to do so by the agent

and Norris, after he had stopped it a second time, and because he said he would not do so for Jesus Christ; that for this blasphemous remark the company should pay the defendant in error the full amount of the damages assessed by the jury in this case.

Let us look at the testimony touching this position. It is assumed by counsel that the conductor *knew* that the defendant in error had not left the cars before he started the train from the depot.

Every fact developed by his subsequent course refutes this position of counsel, for it is only based upon a presumption.

What were his acts? So soon as the conductor was notified (while the train was moving out of the depot) "that there was a sick man on board, who wanted to get off there," using the language of the party hailing him, he immediately stopped the train; if he had known he was on the train, *why would he have started the train, and then have stopped it for the sick passenger to get off?*

The statement of the question is sufficient to show, under the circumstances, that he was entirely ignorant of the fact that Statham was still on the train.

The conductor testifies that when he first saw the defendant in error, after the train stopped, he was standing on the platform of the gentlemen's car, farthest from the depot platform; "that he asked to be taken out there." That he made not the least objection to getting off the car where he was standing.

There is not a particle of proof in the record that he asked to be taken off at any other point.

Defendant in error did not ask the conductor to back the train; it nowhere appears in the record that he had desired his friends to ask that it should be done. If Seal, Thompson, or Lenoir had asked the conductor to back the train, they would not have neglected proving it at the trial. If this view of the testimony is correct, defendant in error voluntarily left the car at the place he presented himself for debarkation.

A chair was procured from the station-house, by order of the officers of the company; he was carefully placed in it, and with

the assistance of the employees of the Company and his friends, he was safely carried to the station-house, where he received the kind hospitalities of the Company's agent, Mr. Childs.

It was proven, by four of the witnesses who testified as to the fact, that the ladies' car, the one immediately in the rear of the car Statham was in, was lying nearly, if not its entire length, alongside of the station platform, after the train was stopped the second time. Statham admits it; Seal, Smith, and Childs swear positively that it was so standing. Here we have the testimony of four witnesses — Statham at the head of them — against the impressions of the witness Thompson.

If the witness was so much at fault in his view of the situation of the cars, as to state that "the impression of his own mind, that the entire train had passed the platform, was the fact, is it not reasonable to suppose he was equally mistaken in his other statement, when he says, "it was his opinion that if the train stopped at all, *he is sure it did not stop long enough for a well man to get off the cars, much less one so sick as the plaintiff was.*" He seems to have forgotten that *he got off the train on the occasion.*

We come now to consider the second ground urged by counsel, why this verdict should not be set aside.

The conductor, Smith, positively denies that he made the remark, that he would not back the train for Jesus Christ, or that he heard the remark made by any one.

William Childs testified, that he heard the exclamation, "that he would not back the train for Jesus Christ." He also stated that the train was behind time; that this remark was made by some one who had his head *out* of the baggage car. He could not say who it was, on account of the distance he was from it. "He had frequently seen the conductor of that train, and knew him by sight."

On cross-examination, he stated: "He would not pretend to say who it was that made the remark above quoted, or that it was said by the conductor, or any officer of the road."

The proof shows that the remark, "he would not back the train for Jesus Christ," when requested to do so by Messrs.

Childs and Norris, *was not heard* by them, or by any other person than the witness, William Childs.

The remark was not made to Mr. Statham, the only party who had a right to complain about it, *neither did he hear it;* therefore the remark, if made by the conductor, was not, nor could it have been, intended as an insult to defendant in error.

The worst that can be made of this " blasphemous exclamation," admitting, for the purposes of this opinion, that it was made, is, that it was intended to show his great reluctance to back his train, under the circumstances he was placed in by the previous loss of time, occasioned by the changing of cars at Jackson, which, if he had done, " he would have lost five minutes more time."

The jury had nothing to do with this remark, in making up their verdict; any consideration of it by them was improper. It can scarcely be contended that the plaintiff in error should be made to pay (for a blasphemous remark of one of its employees) a large amount of money to a party *who did not hear it.*

The attempt to fix this " blasphemous remark " upon the conductor Smith, by the testimony, it seems to us was a failure. How, and by what process of reasoning, this remark can be construed into an insult to Mr. Statham, we are at a loss to conjecture.

The testimony of William Childs amounts to nothing, when it is considered in connection with the denial of conductor Smith, as he utterly failed to fix the remark upon him, or upon any officer of the company. It is not a little remarkable, that he could not identify the conductor as the party who made the exclamation aforesaid, as it was at the distance of not over two hundred feet from him; and knowing the conductor by sight, *although he could hear* what no other person on the platform or cars heard.

Under this view of the testimony, bearing upon the second ground, argued in support of the verdict under consideration, we consider the position of counsel clearly untenable.

Another ground insisted upon by counsel is, that the defend-

ant in error, by the provisions of our Revised Code, art. 43, p. 299, is entitled to recover exemplary damages, where no actual damages or pecuniary injury has been sustained by him.

This statute, for the protection of railroad passengers, as its language clearly indicates, is intended to hold railroad companies responsible for actual damages, for all accidents, to any passenger, caused by the neglect of the employees of railroad companies.

It looks entirely to compensating damages. It suggests no idea of revenge or punishment for their neglect of any public duty.

This principle of exemplary damages for negligence has been extended to a class of cases usually as falling within it — cases of gross negligence.

To sanction it in these, the negligence, according to the most carefully considered authorities, *must be so great* as to amount to recklessness; that is, to a degree where a generally malicious or malignant purpose, careless of consequences, might, perhaps, be pursued, although no hostile purposes were entertained against an individual. Sedgwick on Damages, 7 Cala. Rep. p, 118; 20 Wisconsin Rep. 358; 2 Hills, 440.

The defendant in error having suffered no actual injury to his person by the cars failing to wait his time for getting off when the train first stopped, and having failed to show that the conductor refused to permit him to get off on the station platform, through or from the ladies' car, which he could have done if he had desired to do so, he has certainly failed to make a case for exemplary damages under the rule last quoted.

The testimony in this case proves beyond a doubt that the train had never left the depot at Terry at any time, before the defendant in error left the cars; consequently, no responsibility can be fixed upon the company, rendering them liable for exemplary damages. As the conductor did not refuse to wait for the defendant in error to leave the cars at any point he might desire, what Mr. Statham did was clearly voluntary, without force or violence.

Under this view of the testimony, the conclusion is irresisti-

ble, that the verdict was *against the weight of evidence*, and *manifestly wrong ;* and for this reason the court should have sustained the motion for a new trial.

As the case has to be tried again, we deem it proper to consider the next ground urged for a new trial; that the court erred in giving instructions to the jury, and in refusing others, and for the modification of some, now made here the grounds for error by the second assignment.

The seventh instruction given to the jury, at the instance of the defendant in error, is in these words: " The peculiar condition of the plaintiff's health on the occasion when he went on the cars, and the danger arising from that cause, from exposure to inclemency of the weather, may be given in evidence in aggravation of damages."

If there had been any evidence of exposure to the inclemency of the weather of the defendant in error by the conductor of the company, which caused bodily suffering or injury to the defendant in error, and which could have been avoided by the conductor, then the instruction might have been proper, if the defendant in error was not guilty of concurrent neglect.

There was no attempt on the part of the defendant in error to prove that he suffered any injury from exposure.

There was testimony showing that he was at fault in not having himself in a position to be taken off the train when the cars first stopped. The testimony is uncontradicted, that, after the cars stopped the second time, he left the cars voluntarily, at the place of his and his friends' own choosing.

This instruction was irrelevant under the circumstances and proof in the cause, and may have misled the jury, and should not have been given.

The eighth and ninth instructions, are mere abstract propositions of law, not made applicable to the case before the jury. This court has repeatedly held these instructions to be erroneous.

The tenth instruction is as follows: " In an action by a passenger against a railroad company to recover damages on account of the conductor having conveyed the passenger to

a point beyond the place for which he had taken passage, and then compelling him to leave the cars, the jury are authorized, in assessing damages, to allow not only just compensation for the injury, but to inflict proper punishment on the railroad for this disregard of their public duty; in such cases they may find exemplary damages, the amount of which they are the sole judges."

This instruction is as objectionable as the eighth and ninth instructions given for defendant in error. There is no attempt to make an application of the principle of law announced in the instruction, to any supposed state of facts developed by the testimony in the cause. It should have been refused by the court below, and it was error to give it.

The eleventh instruction, given at the instance of the defendant in error, is in these words: "In this action it is not necessary to show that the plaintiff sustained any actual injury in order to entitle him to recover exemplary damages or punitive damages, if the jury believe from the evidence that the railroad *failed to allow* the plaintiff sufficient time to get off at the depot for which he had taken passage."

This instruction announces a doctrine repugnant to all well-settled principles governing cases wherein punitive damages are allowed.

It must have reference to the time when the train first stopped at Terry; for this failure of the defendant in error to get off the train, the jury are instructed to find exemplary damages against the plaintiff in error, if there was not time enough allowed for him to get off; in other words, for an omission to stop long enough, or for a simple neglect of duty, unaccompanied by violence, insult, or oppression, the jury are instructed to find exemplary damages. This is carrying the doctrine beyond all precedent.

The jury could construe this language into a direct interference, on the part of the conductor, to prevent the defendant in error from getting off the train at Terry depot, although there was not a particle of proof that the conductor knew the defendant in error had not left the train. By taking this view of

APRIL TERM, 1869. 623

New Orleans, Jackson, and Great Northern Railroad Co. v. John B. Statham.

the language of this instruction, they certainly would have some authority for finding a verdict for exemplary damages.

There can be but little doubt that this instruction had much to do with the jury in the construction of their verdict. They could feel authorized to find a verdict for exemplary damages — if they believed the defendant in error failed to leave the train, when it first stopped at Terry, whether such failure was caused by the conductor, or the neglect of the defendant in error, or of his friends who were with him. The mere fact of his failure to quit the train, they could readily ascribe to want of time for him to do so. Believing this, they felt no doubt bound to find a verdict for exemplary damages against the plaintiff in error.

The proof was ample, that the entire train had not passed the platform before the train was stopped a second time.

It is true, the car in which Statham was in had passed the platform of the station some sixty feet. This passing of the platform was "the carrying beyond the station for which he had taken passage."

If any actual injury was sustained by the defendant in error by being carried the sixty feet beyond the platform, the jury were not allowed to find such compensatory damages against said company as the defendant in error was entitled to, if any.

The jury are instructed, if they believe one fact, that is sufficient for them to find a verdict against the plaintiff in error for exemplary damages.

To state a portion only of the material facts connected with a particular transaction, and to omit others of great importance in an instruction, cannot but lead to great injustice to the opposite party.

The facts omitted, if stated, might lead the jury to an entirely different conclusion. Therefore, to instruct a jury, if they believe such a fact is proven, without stating the other material portions of the same transaction, that they can find a verdict for one party or the other, cannot be too severely reprehended.

The jury feel bound to regard the fact thus isolated for their

consideration as the only important fact in the cause, which should govern them in making up their verdict.

In the case before us, one of the supposed facts was selected to be incorporated into the eleventh instruction, of very little consequence when viewed in connection with all the testimony touching the transaction, and thus made the authority for the jury to make up a verdict against plaintiff in error of exemplary damages, with a license to find, for any amount they might see proper to inflict, as a punishment upon the plaintiff in error. It made law for the jury, instead of directing their attention to the correct law applicable to such a case.

The court refused to grant the *third* instruction asked by the plaintiff in error, which is in these words: " If the jury believe that the plaintiff requested to get off the cars when they stopped at Terry, it was no fault of the road; and when the cars stopped a second time to let him get off, they were under no obligations to back their train."

This was modified by the court, by striking out the word " second," and by inserting the words "sufficient length of " before the word " time ; " after this alteration, it is not very intelligible. We suppose the court intended to instruct the jury, if they believed sufficient time was allowed by the conductor, when the cars first stopped, to let him get off, then the conductor was under no obligations to back his train; otherwise he should have done so.

This instruction should have been given as asked. There was evidence before the jury that there was sufficient time for the defendant in error to have gotten off the train during the time it first stopped. The jury should have been left free to believe or disbelieve this portion of the testimony. Also there was proof that the defendant in error made no exertions to get off the train when it first stopped; and if they should believe this, the plaintiff in error's conductor was under no obligations to back his train when it stopped the second time, or if the defendant in error could have gotten off the train after it stopped the second time, without the necessity of its being backed. There was proof that he could have reached the station platform through

APRIL TERM, 1869. 625

New Orleans, Jackson, and Great Northern Railroad Co. *v.* John B. Statham.

the ladies' car, which was alongside of the platform. This modification of the court was erroneous.

The first instruction asked by the plaintiff in error was also modified by the court as originally drawn. It was as follows: "It is no part of the duty of the defendant to remove passengers from the railroad cars when they arrive at their journey's end; and the fact that a passenger may be ill does not alter this rule." This instruction, to the words "journey's end," was given by the court, and the other portion of it was refused, and stricken out.

This instruction should not have been modified, but should have been given as asked by counsel, for the reasons hereinbefore expressed; and it was error to refuse it.

The *fourth* instruction asked by the plaintiff in error is in these words: "If the jury believe from the evidence that no actual damage was done to the plaintiff, and the conductor of the road was guilty of no intentional neglect, they will find for the defendant."

This was amended by the court by striking out the word "intentional."

This modification should not have been made.

Without *intentional neglect*, there could be no pretence for holding the railroad company liable for exemplary damages.

As it was given, the jury may have considered it proper to find exemplary damages against the plaintiff in error, for simple, or the least possible neglect, on the part of the conductor, *when no actual damages* were sustained by the defendant in error.

Under this view of the case, our conclusion is, that the second assignment is well taken.

This brings us to the last ground stated in the motion for a new trial, and made the last assignment of error, — "that the damages are excessive."

What are the facts of the case, and upon which this verdict was based?

The defendant in error was sick when he entered the cars at Jackson, and remained so until he arrived at Terry station. The train stopped there; he failed to get out; he made an effort

40

to rise from his seat, but could not do so; asked no one to assist him to leave the train; the train started again; the train was again stopped; he presented himself on the platform of the car he rode in, at the end most distant from the station platform. From thence he walked down to the ground, was immediately placed in a chair, and carefully conveyed to the station-house and kindly treated by the agent; was not forced to leave the car at the place he did leave it; did so voluntarily. The train had not entirely left the station platform before it was stopped a second time; defendant in error could have left the train, from the ladies' car, and stepped on the platform, as it was alongside of the platform.

One witness said he heard some one say, " he would not back the train for Jesus Christ;" did not know who said it; could not identify any one of the employes of the railroad company as having said it. This was denied by the conductor; the defendant in error did not hear the remark, neither did any other person hear it. Not the least incivility or insult was offered to defendant in error on the occasion in question.

Violence, oppression, or malice nowhere appears in the proof as having been shown by the conductor to the defendant in error.

The power of giving exemplary damages should be exercised with great caution.

A jury should be watchful that their verdict should not be so extravagant as to indicate that they have assumed the office of avengers of the plaintiff's wrongs, without due consideration of any apology or explanation for the defendant's conduct, which, to some extent exists, in all cases. Redfield on Railways.

It seems to us clear, after a careful examination of the testimony in the cause, that the jury disregarded this rule, and acted the part of avengers of the fancied wrongs of the defendant in error, aided by the erroneous instructions given to them by the court.

The learned Supreme Court of the State of Pennsylvania, in a recent case, the *Pennsylvania Railroad Company* v. *Kelly*, 7 Casey, p. 373, in noticing the tendency of juries to inflict heavy

damages upon corporations, uses this language: "Generally speaking, the influence of the court, in this class of cases, should be exerted to restrain those excesses into which juries are apt to run. . . . Wild verdicts are frequently rendered. And the tendency in modern times *undoubtedly is to excessive damages, especially when they are to be assessed against corporations and railroad companies.*"

The observance of this suggestion of the learned Chief Justice by the Circuit Court of the State doubtless would prevent oppression and great injustice, in many instances, from being inflicted upon corporations and railroad companies.

It seems eminently proper, that every possible safeguard should be thrown around the rights of corporations and railroad companies by the court, where the interests of innocent stockholders are involved or at issue, particularly when their pecuniary interests are to suffer for the acts of their employees, when exemplary damages are sought against them at the hand of a jury, no special damages having been demanded or shown by proof.

It is insisted by counsel for the defendant in error, with great earnestness, that this court should not disturb the verdict of a jury, let the amount be ever so large; that courts of last resort very rarely disturb verdicts on the ground of being excessive, referring us to the rule laid down by Chancellor Kent in the case of *Coleman* v. *Southwick,* 9 John. 49; ib. 10, p. 443, and cases there cited. Chief-Justice Redfield, in referring to this rule, says, "This is no doubt a safe rule, and perhaps the only safe rule, in such cases; but there are many cases where new trials have been granted for this cause, falling far short of these in excessiveness."

This view of the rule is supported by reason and the highest authority.

Counsel for defendant in error contend that this verdict under consideration should be sustained by this court, because this court refused to set aside the verdict in the case of the *New Orleans, Jackson, and Great Northern Railroad Company* v. *Hurst,* 7 George.

The facts stated by the court in that case differ widely from the case under consideration.

The reasons given in the opinion for the refusal to disturb that verdict were, that "violence and insult and oppression" were shown to Hurst by the conductor of the company, and that the acts of the conductor were ratified and approved by the company before the suit, and that the company fully sustained him in his tortuous acts.

With all due respect and deference to the opinion of our able and distinguished predecessors, we think the verdict should have been set aside in that case.

Mr. Sedgwick, in his valuable work on Damages, in discussing the doctrine of exemplary damages, and the cases where verdicts have been and ought to be set aside, where the damages are excessive, uses this language in reference to the case of the *New Orleans, Jackson, and Great Northern Railroad Company* v. *Hurst :* "The case of the *New Orleans, Jackson, and Great Northern Railroad Company* v. *Hurst,* 7 George Miss. Rep., would seem to carry the principle of exemplary damages to its extreme limit, if it has a limit, or rather, *if rightly decided,* to show that there is none."

The jury having in that case found a verdict for $4500 against a railroad company for the misconduct of a conductor in carrying the plaintiff four hundred yards beyond the station, and refusing to return, so that, to avoid being taken to the next station, he had to walk back, carrying his valise — the court, while regretting the rigor of the jury, refused to set aside the verdict, saying, that the law in such cases furnished "no legal measurement, save the discretion of the jury."

"In this case we think, with deference, that the verdict might with great propriety have been set aside. The amount warranted the presumption of undue bias."

The court in that case evidently adhered to the rule in actions involving moral delinquency on the part of the defendant, such as *libel, slander, seduction, crim. con., abduction,* and other cases involving moral turpitude.

Examples are very rare in which the damages have been

New Orleans, Jackson, and Great Northern Railroad Co. *v.* John B. Statham.

found to be so excessive in this class of cases as to induce a court to order a new trial.

The cases cited in the opinion of the court in the case of Hurst are nearly all of the character just alluded to.

We think the strongest rule adopted by courts of last resort, in refusing new trials, in the class of cases just adverted to, should not be applied to cases like the one under consideration.

We are sustained in this view by numerous decisions of courts of the highest respectability in the United States and England.

In the case of the *Chicago, Burlington and Quincy Railway Company* v. *Parks,* 18 Illinois Rep. p. 460, a verdict was set aside where the plaintiff was wrongfully *expelled* from the cars between stations, and the jury gave him $1000 damages.

A new trial was granted on the ground that the damages were excessive, no special damages having been shown. In that case the plaintiff was put off several hundred yards from a station, in the rain and mud; he suffered only inconvenience and discomfort.

So when $6000 was awarded for a broken leg, of which the party recovered in about eight months, a new trial was granted on the ground of excessive damages. *Collins* v. *Albany and Chenango Railroad Company,* 12 Barbour, p. —. Also verdicts were set aside for excessive damages in the following cases: 21 Pickering, 381; 23 Wendall, 435; 15 New York Court Appeals, 415; 15 La. Ann. 337; 13 ib. 116; 2 Comstock, p. —. It is unnecessary to multiply authorities.

We would not disturb a verdict for damages where it was not apparent to us that the jury had either misapplied the law or misunderstood the facts, or had been influenced by their prejudices or passions rather than by an observance of the law and the facts of the case.

It is true, great latitude has been allowed to juries in estimating damages; but to this power there must be a limit.

It is not the duty of this court to enforce an arbitrary verdict of a jury, but it is incumbent upon the court firmly and fear-

lessly to protect a party from such a verdict where it is manifest the verdict is the result of prejudice or undue bias.

The verdict in the case before us cannot be sustained on principle, and if we were to refuse to set it aside, it would be tantamount to saying to juries: We will not interfere with a verdict for damages against a railroad company or corporation. You can assess any amount of damages against them you see proper: your verdicts will not be disturbed; when they are in your hand, do with them as you please.

To sustain the verdict under consideration upon the facts developed by the testimony in the record, would be a direct encouragement to the corrupt and unscrupulous to harass the innocent stockholders of railroad companies with suits of a purely speculative character, under pretence of vindicating the right of the travelling public, or of punishment for neglect of public duty.

This tendency of juries, spoken of by Judge Sharwood, to find " wild verdicts " where a corporation or railroad company is concerned, we think, is clearly exemplified by the verdict under consideration.

Unless, misled by the erroneous instructions of the court, the jury believed infinitely more than the defendant in error proved, and disbelieved or disregarded all the testimony for the plaintiff in error, it would seem, for no other reason than that the witnesses happened to be one of the conductors and station agents of the company — agents selected from the best men attainable for these responsible positions — men characterized for their sobriety, fidelity, integrity, intelligence, and urbanity, through whose hands must necessarily pass much of the funds arising from the business transactions of the company.

This can only be accounted for upon the hypothesis, that the jury consulted their prejudices against corporations rather than their duty as impartial arbiters between the parties litigant.

A corporation or railroad company, in consequence of this prejudice, has not the same *status* before a jury of the State that an individual has who may be litigating with one.

This last assignment of error is well taken, and for this

ground of objection to the verdict, the court below should have set aside the verdict, and granted the plaintiff in error a new trial.

. Let the judgment be reversed, the verdict set aside, and *venire de novo* awarded.