THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. CONRAD WEBER, as *Administrator of the estate of Philip Weber, deceased.*

1. INJURY CAUSING DEATH; *Nominal Damages.* In an action brought against a railroad company in behalf of the next of kin, by the personal representative of a deceased person, to recover damages for injuries resulting in the death of such person, nominal damages may be recovered if it appears that his death was caused by the wrongful act or omission of the defendant, although no actual pecuniary damages may have been shown or suffered.

2. OFFENSIVE CONDUCT OF PASSENGER; *Duty of Railroad Company.* It. is the duty of a railroad company carrying passengers, to provide for their quiet and comfort, and secure them against the annoying and offensive conduct of other passengers; and where the conduct of a passenger is such as to render his presence dangerous to fellow-passengers, or such as will occasion them serious annoyance and discomfort, it is not only the right, but the duty of a railroad company to exclude such passenger from its train.

3. SICK OR INSANE PASSENGER; *Duty of Carrier.* Where an unattended passenger, after entering upon a journey, becomes sick and unconscious or insane, it is the duty of the railroad company to remove him from the train, and leave him until he is in a fit condition to resume his journey,. or until he shall obtain the necessary assistance to take care of him to the end of his journey. ·

4. SICK PASSENGER, *to be Provided for; Overseer of Poor.* The duty of a railroad company to such a passenger does not end with his removal from the train, but it is bound to the exercise of reasonable and ordinary care in temporarily providing for his protection and comfort; and *held,* that the railroad company may have exercised due care toward such a passenger who was without friends or money, when it carefully and prudently removed him from its train and promptly placed him in charge of the overseer of the poor. The statute makes it the duty of an overseer of the poor in any township or city to grant temporary relief to any nonresident who may be found lying sick therein, or in distress and without friends or money, and the expense of providing such relief is to be paid out of the county treasury.

5. SPECIAL FINDINGS— *General Verdict—New Trial.* Where a jury return important and material special findings upon which the general verdict may have been mainly founded, and which are untrue and inconsistent, their verdict should be set aside, and a new trial granted.

*Error from Atchison District Court.*

ACTION brought by *Conrad Weber*, as administrator of the estate of Philip Weber, deceased, under § 422 of the civil code, to recover damages on account of the death of the plaintiff's intestate, alleged to have been caused by the negligence and wrongdoing of the *Atchison, Topeka & Santa Fé Railroad Company.*

On the 31st of October, 1881, the deceased was a passenger on the defendant's road from Hutchinson, bound eastward to Atchison, to which latter place Philip Weber had paid railroad fare and held a ticket. It is claimed by the plaintiff, that after leaving Hutchinson, and before the passenger train reached Newton, Philip Weber became ill, and was in a helpless and insensible condition; and that at eight o'clock in the evening, the employés of the defendant on the train "did thrust, force, push and drag him," the said Philip Weber, from their cars, and then carelessly and inhumanly left the said Philip Weber lying on the platform at Newton, aforesaid, in an exposed condition, and wholly unprotected from the cold and inclemency of the weather, and did then and there abandon him, and leave him wholly unprotected and uncared for for the space of two hours or more; and as a result of such treatment and negligence of the defendant, said Philip Weber died, on or about the first day of November, 1881.

The defendant denies any wrongdoing on its part, and alleges that when Philip Weber came upon the train at Hutchinson, Kansas, he was afflicted with delirium tremens, and was so violent and disgraceful in his conduct toward the other passengers of said train, that said defendant, by its agents and employés, was compelled to remove and did remove him from its cars, at the city of Newton, using no more force therefor than was absolutely necessary, and placed him in charge of the city authorities of the city of Newton for care and protection; and that said Philip Weber was not left lying upon the platform at Newton in an exposed condition, for any longer

time than was necessary to secure for him proper care and attention.

Trial was had at the June Term, 1883, of the district court, and the following special findings of fact were returned:

SPECIAL QUESTION OF FACT SUBMITTED BY PLAINTIFF.

"What were the necessary funeral expenses incurred in burying Philip Weber? A. One hundred and eighty-two dollars and fifty cents."

SPECIAL QUESTION OF FACT SUBMITTED BY DEFENDANT.

1. What was the age of Philip Weber at the time of his death? A. Thirty-six years.

2. Did he leave wife or child, a father or mother? A. No.

3. Did he leave as his next of kin his brothers Conrad Weber, John Weber, Frederick Weber, Jacob Weber, and his sister Margaret Gerloch? State age of each. A. Yes; but ages not known.

4. Did Philip Weber contribute anything to the support of his next of kin; if so, to what ones, and when was it done, and in what did it consist? A. Mrs. Gerloch and family, Mrs. Conrad Weber and John Weber; date unknown; watch, clothing, and money, and holiday presents; inside of fifteen years.

5. Are each of said next of kin able to support themselves, and are they in comfortable circumstances? A. In part, and in medium circumstances.

6. Was said Philip Weber at the time of his death in poorer circumstances than any of his next of kin? A. Can't tell.

7. Had said Philip Weber been in the habit of using all of his earnings in defraying his personal expenses? A. No.

8. Did Philip Weber ever accumulate any property from his labor or in his business transactions? If so, state when he had such property, its value, and what it consisted of. A. Do not know.

9. Was not all the property belonging to Philip Weber inherited by him a short time before his death? A. Yes.

10. Was he not in very bad habits as to the drinking of intoxicating liquors for years before his death? A. Yes.

11. What personal or real property did Philip Weber leave, if any? What was the value of the same, and of what did it consist? A. Something over three hundred dollars. Three hundred dollars and over, money, and promissory note.

12. Did any of his next of kin depend on him for support? A. No.

35 — 33 KAS.

13. Did Philip Weber take defendant's train as a passenger at Durango, Colorado, on October 28th or 29th, 1881, intending to go to Atchison, Kansas? A. Suppose he did.

14. Did he get off said train at Hutchinson, Kansas? A. Yes.

15. Why did he leave defendant's train at said station? A. Can't tell.

16. Was he sick and suffering from the result of drinking intoxicating liquors to excess? A. Think he was.

17. Was said Philip Weber placed in an east-bound train passenger car of the defendant's at Hutchinson, Kansas, by the city officers of that place on the 31st day of October, 1881? A. Yes.

18. Had he been in Hutchinson since the day before, suffering from the effects of excessive drinking? A. Think he was.

19. Was he placed in said car by any of the agents or servants of the defendant? A. No.

20. Was he capable at the time he was placed in said car of taking care of himself? A. With proper care.

21. Could said Philip Weber sit in the seats provided for passengers in said car? A. Yes.

22. Was he in a fit condition to travel on defendant's train without injuring him? A. Think not.

23. Did said Philip Weber immediately after being placed in a seat in said car, slip or fall therefrom into the aisle or passage-way thereof, and ride lying in such place a part of the way going to Newton? A. Yes.

24. What is the distance from Hutchinson to Newton? A. 33 miles.

25. What is the distance from Hutchinson to Atchison? A. 218 miles.

26. Did the agents or servants of the defendant know that said Philip Weber had been placed in said car, and the condition he was in, until after the train had started to leave Hutchinson? A. No.

27. Was it necessary to remove Philip Weber from defendant's train at Newton? A. Do not know.

28. Was he so removed by and under the direction of one of the police officers of the city of Newton? A. No.

29. Did the city marshal of the city of Newton ascertain that said Philip Weber was at defendant's station, and did said marshal take charge and control of him immediately after his removal from said car? A. After said Philip Weber had lain

on the stone steps of the platform for over one hour, in an unconscious state, then the city marshal took charge of said Philip Weber.

30. Did the city marshal of Newton have charge of said Philip Weber from the time he was removed from said car until about 2 o'clock P. M. of November 1st, 1881, when he was removed to the Howard House? A. After the expiration of one hour or over.

31. Was Philip Weber kept in the city prison and engine house from about 8:30 P. M. of October 31st until he was removed to the Howard House? A. From 9 o'clock P. M. of October 31st, he was.

32. Were said places cold, and unsuited for the occupancy of a person in his condition? A. Yes.

33. Did not his confinement in said places have more to do with hastening his death than any other exposure he was subjected to? A. It might have had as much, but not more.

34. Was said Philip Weber conscious at the time he was placed on the defendant's train at Hutchinson? A. He was.

35. Was he in a fit mental condition to provide for his own safety on the train? A. At times he was.

36. Shortly after leaving Hutchinson, and while said train was in full motion, did he not try to jump off of said train, and was he not prevented from so doing by one of the defendant's employés? A. We doubt it.

37. Did he not endeavor to escape from the car in which he was placed, three times, intending to jump therefrom while said train was in full motion, and was it not necessary for the train hands to watch him to prevent his so doing? A. No.

38. Did the employés of the defendant watch and care for said Philip Weber while he was in said car, and prevent him from injuring himself by jumping off? A. No.

39. Was not Philip Weber, at the time he was removed from the train at Newton, in such a condition as to render it unsafe for him to continue his journey to Atchison, Kansas, without medical treatment, or anyone to care for him? A. We think it was.

40. Could not Philip Weber receive better care from the city authorities of the city of Newton than it was possible for the defendant's employés to give him on the train? A. Yes.

41. Was he out of his proper state of mind and delirious while in said car; did he remove his shoes, complain that they were full of bugs and worms, and conduct himself in such a

way as to annoy and frighten other passengers in said car? A. Yes.

42. Did a number of passengers leave said car and go to other parts of the train because of his conduct? A. A few.

43. Was his habit of so drinking increasing? A. Don't know.

44. If said Philip Weber had lived, was it probable that his habits would have improved? A. Do not know.

45. Was the sickness of Philip Weber, just before his death, caused by excessive drinking? A. Do not know.

46. Did he have the delirium tremens? A. Had delirious tremors.

47. Did he have a disease of that nature? A. Yes.

48. Was his life of any pecuniary value to his next of kin at the time of his death? A. No.

49. Were the habits of the deceased such, at the time of his death, that they would necessarily shorten his life, disable him from performing labor or transacting business, and make his expenses equal to his earnings? A. Yes.

50. Strictly as a pecuniary question — as a mere matter of money — what was the loss of the next of kin of said Philip Weber by his death? A. No loss.

51. State wherein the next of kin sustained any pecuniary loss by the death of Philip Weber, and in what did that loss consist. A. Sustained no loss.

52. What is the probable amount that the deceased would have earned or made per year had he lived? A. When in health, six hundred dollars.

53. What would the expenses of the deceased probably have been per year, had he lived? A. Depends upon circumstances.

54. How long would said Philip Weber probably have lived if he had recovered from his last sickness? A. Probably a natural lifetime.

55. If he had lived, how much more property or money would his next of kin have received from his accumulations than they did receive? A. Cannot tell.

56. Of what other pecuniary value was the life of Philip Weber to his next of kin? A. No other pecuniary value.

57. At the time of his death was he not in poor health and bad habits, caused by excessive drinking? A. In bad health, not necessarily caused by excessive drinking.

60. What amount, if anything, do you find the plaintiff is entitled to recover as a pecuniary compensation to the next of

kin for the loss of said Philip Weber? A. Four hundred dollars.

64. Is it not a fact that Philip Weber was in such a condition, at the time he was removed from the train, that it was unsafe for him to continue his journey to Atchison? A. Without proper care, he was.

65. Is it not a fact that when the conductor had Weber removed from the train at Newton he placed him in charge of one of the policemen of said city, and told him to do everything he could for him, as he was in such condition that he could not take him on the train? A. No.

66. Is it not a fact that Weber was turned over to the city marshal and overseer of the poor at Newton before the train left the depot in that place? A. He was not.

67. Is it not a fact that the city marshal and overseer of the poor at Newton tried to get a place at the hotels and boarding houses to take Weber, and failed on account of Weber's filthy condition? A. The lack of money the cause, and not his filthy condition.

68. Is it not a fact that the city marshal and overseer of the poor at Newton took Weber to the city jail only after having failed to get him into a hotel or boarding house, and after having been directed so to do by the county physician? A. No.

69. Did Weber contract any disease or sustain any injury during the time after he was taken from the car and before he was placed under the charge of the city marshal, and if so, how much, and to what extent? A. Sustained an injury which resulted in his death.

70. Was Weber's health in any manner injured, or his death in any manner hastened, by his accommodations and treatment after he was taken charge of by the city marshal and overseer of the poor? A. It was.

71. Was not Weber's death caused by the delirium tremens? A. No.

72. Was Weber's death caused or hastened by his exposure while in the city prison? A. In part.

73. Was not Weber's death caused by excessive use of intoxicating drinks and his confinement in the city prison at Newton, Kansas? A. In part.

75. Did not Weber have a sufficient estate to pay all funeral and burial expenses? A. Yes.

The general verdict of the jury was in favor of the plaintiff, and assessed the damages at four hundred dollars. The de-

fendant moved the court for judgment in its favor upon the special findings of the jury, notwithstanding the general verdict, which motion the court overruled and ordered judgment for the sum of $217.50, which was the amount found by the jury, less the funeral expenses, which were disallowed by the court. The defendant moved for a new trial upon the ground of excessive damages appearing to have been given under the influence of passion and prejudice; that the findings and verdict of the jury are not sustained by the evidence, and for errors of law occurring at the trial. This motion was overruled. The defendant duly excepted to the ruling of the court, and brings error to this court.

*A. A. Hurd, Robert Dunlap,* and *Mills & Wells,* for plaintiff in error; *Geo. W. McCrary,* general counsel.

*Everest & Waggener,* and *Webb & Martin,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J.: The plaintiff, who is the personal representative and brother of Philip Weber, deceased, brought this action in the district court of Atchison county, in behalf of the next of kin, to recover the damages suffered by them in the death of Philip Weber, caused, as plaintiff alleges, by the wrongful act and neglect of the railroad company. The verdict and judgment were in favor of the plaintiff, and the defendant comes here assigning error on several exceptions that were taken during the trial.

It is first contended that the court erred in overruling the motion of defendant for judgment in its favor on the special findings returned by the jury. Upon the trial of the cause the defendant sought to show, among other things, that for several years prior to his death, Philip Weber lived a reckless and dissipated life, and that by reason of the excessive use of intoxicating liquors and other causes, his condition at the time of the alleged injury was such that his survivors suffered no pecuniary loss in his death. The jury, in answer to special

·questions submitted to them, found, as will be seen, that none of his next of kin depended upon him for support; that his life was of no pecuniary value to them, and that they sustained no loss by his death.

The claim of counsel for the defendant is, that notwithstanding the death of Weber may have been caused by the wrongful act or omission of the railroad company, yet as there was no actual damage or pecuniary loss sustained by his next of kin, not even nominal damages can be recovered. In this we think counsel are mistaken. The deceased was entitled to his life, and presumably the next of kin had some interest in his existence. A right of action is expressly given by the statute in behalf of the next of kin where the death of one is caused by the wrongful act or omission of another; provided the deceased, if he had lived, might have maintained an action for the injury caused by the same wrongful act or omission. The law infers an injury whenever a legal right has been violated, and every injury imports a damage. As a general rule, where the law gives an action for a wrongful act, the doing of the act itself imports a damage, and even if no actual pecuniary damage may have been shown or suffered, still the legal implication of damage follows the wrongful act, and nominal damages at least may be recovered. Some of the English courts have held that if no actual loss is shown, nominal damages are not recoverable; but the American courts, so far as our observation goes, uniformly hold, under statutes similar to our own, that where a person has met with death caused by the wrongful act, neglect or default of another, whenever there are next of kin, nominal damages at least may be recovered. (*Lehman v. City of Brooklyn*, 29 Barb. 234; *Dickens v. Railroad Co.*, 1 Abb. Ct. App. 504; *Quin v. Moore*, 15 N. Y. 432; *Ihl v. Forty-second Street &c. Rld. Co.*, 47 id. 317; *Chicago & Alton Rld. Co. v. Shannon*, 43 Ill. 338; *C. & N. W. Rld. Co. v. Swett*, 45 id. 197; *City of Chicago v. Scholten*, 75 id. 468; Thompson on Negligence, 1293.)

The further point is made by counsel for the railroad company, that the findings and verdict of the jury are not sustained

by the evidence. In response to special questions submitted by the court, the following findings of fact were returned by the jury:

"Was he so removed by and under the direction of one of the police officers of the city of Newton? *Answer:* No.

"Did the city marshal of the city of Newton ascertain that said Philip Weber was at defendant's station, and did said marshal take charge and control of him immediately after his removal from said car? A. After said Philip Weber had lain on the stone steps of the platform for over one hour in an unconscious state, then the city marshal took charge of said Philip Weber.

"Did the city marshal of Newton have charge of said Philip Weber from the time he was removed from said car until about two o'clock P. M. of November 1st, 1881, when he was removed to the Howard house? A. After the expiration of one hour or over.

"Is it not a fact that when the conductor had Weber removed from the train at Newton he placed him in charge of one of the policemen of said city, and told him to do everything he could for him, as he was in such condition that he could not take him on the train? A. No.

"Is it not a fact that Weber was turned over to the city marshal and overseer of the poor at Newton before the train left the depot in that place? A. He was not.

"Did Weber contract any disease or sustain any injury during the time after he was taken from the car and before he was placed under the charge of the city marshal, and if so, how much, and to what extent? A. Sustained an injury which resulted in his death."

In these findings the jury seem to have either mistaken or purposely disregarded the testimony upon the facts inquired about. The testimony is, that upon the arrival of the train at Newton, a special policeman of that city, who was doing duty at the station of the railroad company, with the assistance of others removed Weber, who was then in an unconscious state, from the train. The train remained at the station about ten minutes. Within a few minutes after he was removed, and within ten minutes after the arrival of the train and before its departure, Weber was turned over to and placed in charge of the city marshal and overseer of the poor. Henry Meyer, who

was the overseer of the poor, says that he took charge of him within from eight to ten minutes after the train came in, and immediately sent for a physician, and made effort to find a hotel or boarding house where he could be received and cared for. This is in effect the testimony of several other witnesses who were there present, and in an examination of all the testimony in the record nothing is found contradicting it. Most of these findings are therefore untrue. Their materiality, when the issues and facts of the case are considered, will not be questioned. When Weber was placed upon the train at Hutchinson, his condition was unknown to the employés of the company in charge of the train. He had been in Hutchinson since the day before, suffering from the effects of the excessive use of intoxicating liquors. He was found by the officers of that city lying on one of the streets in a spasm, and as they state, apparently afflicted with delirium tremens. Shortly after he was placed upon defendant's train at Hutchinson, he was seized with a fit and fell from his seat upon the floor, where he struggled for some time. While going from Hutchinson to Newton, a distance of thirty-three miles, he had several such attacks. When he was out of these spasms he appeared to be somewhat delirious, and the conductor states that he tried to jump off of the train. In the car he removed his shoes, complaining that they were full of bugs and worms, and conducted himself in such a way as to annoy and frighten his fellow-passengers, so that a number of them left the car and went to other portions of the train. When the train reached Newton he had fallen from his seat, and was lying in the aisle of the coach in an unconscious condition. It is clear that the conduct of the deceased justified the railroad company in removing him from its train.

It is the duty of a railway company carrying passengers, to provide for their quiet and comfort, and secure them against the annoying and offensive conduct of other passengers; and where the conduct of a passenger is such as to render his presence dangerous to fellow-passengers, and such as will occasion them serious annoyance and discomfort, it is not only the right

but the duty of a railroad company to exclude such passenger from its train. (*Vinton v. Middlesex Rld. Co.*, 11 Allen, 304; *Commonwealth v. Power*, 7 Metcalf, 596; *Jencks v. Colman*, 2 Sumner, 221; *Lemont v. Washington & Georgetown Rld. Co.*, 1 Am. & Eng. Rld. Cases, 263; *Brown v. Memphis & Charlestown Rld. Co.*, 5 Fed. Rep. 499; *Brown v. Memphis & Charlestown, Rld. Co.*, 1 Am. & Eng. Rld. Cases, 247; *Railroad Co. v. Statham*, 42 Miss. 607.)

And under the authorities, it seems that it is equally the duty of the railroad company to remove from the train and leave an unattended passenger, who, after entering upon a journey, becomes sick and unconscious or insane, until he is in a fit condition to resume his journey, or until he shall obtain the proper assistance to take care of him to the end of his journey. In this case, considerations for the fellow-passengers, as well as for the health and comfort of Weber himself, required that the railroad company take him from the train.

In regard to Weber's condition with respect to completing his journey, the jury made the following findings:

"Was he in a fit condition to travel on defendant's train without injuring himself? A. Think not.

"Was not Philip Weber, at the time he was removed from the train at Newton, in such a condition as to render it unsafe for him to continue his journey to Atchison, Kansas, without medical treatment, or anyone to care for him? A. We think it was.

"Could not Philip Weber receive better care from the city authorities of the city of Newton than it was possible for the defendant's employés to give him on the train? A. Yes."

Under these facts, the propriety of his removal cannot be doubted. The duty of the railroad company, however, with respect to Weber, did not end with his removal from the train. He was unconscious, and unable to take care of himself. The company could not leave him upon the platform helpless, exposed, and without care or attention. It was its duty to exercise reasonable care and diligence to make temporary provision for his protection and comfort. As was said by the learned court who tried the cause: "Of course the carrier is not required

to. keep hospitals or nurses for sick or insane passengers, but when a passenger is found by the carrier to be in such a helpless condition, it is the duty of the carrier to exercise the reasonable and necessary offices of humanity toward him until some suitable provision may be made."

The contention of the railroad company is, that it performed its duty to this passenger when, after taking him from the train, it turned him over to the authorities of a city having four thousand inhabitants, and well supplied with public houses, and especially when it placed him in charge of the overseer of the poor. The statute makes it the duty of an overseer of the poor of any township or city to grant temporary relief to any non-resident who may be found lying sick therein, or in distress, and without friends or money, and the expense of providing such relief is to be paid out of the county treasury. (*Comm'rs of Pottawatomie Co. v. Morrall,* 19 Kas. 141.) This was the condition of Weber; he was in distress, sick, and without friends or money. It became the duty of the overseer, when his attention was properly called to Weber's condition, to take charge of him, and make provision for his temporary relief. We think that if the railway company carefully and prudently removed him from the train, and promptly placed him in the care of the overseer of the poor, who received and took charge of him, that under the facts of this case it has exercised that reasonable care and diligence in making provision for him that the law requires. And here the materiality of the findings in question arises. The jury found that he lay on the platform of the company's depot in an exposed condition for over an hour before he was taken charge of by the overseer of the poor, and that during that time he sustained such injuries as resulted in his death; while, as we have seen, the testimony is that he was placed in charge of the overseer within a few minutes after he was removed from the train. We do not assume to decide whether or not Weber sustained any injury from exposure during the brief time that elapsed after he was removed from the train and before he was taken in charge by the city authorities, nor

whether the railroad company during that time exercised due care toward him, and due diligence in providing for his safety and comfort. But as it appears that these important findings, upon which the general verdict of the jury may have been mainly founded, are untrue, and inasmuch as the jury allowed more than nominal damages, notwithstanding a special finding that the next of kin sustained no pecuniary loss by the death of plaintiff's intestate, the verdict cannot be permitted to stand.

There are other assignments of error, but in view of the conclusion that has been reached, we do not deem it necessary to notice them.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.