# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00226-SCT

*JOHN GARAN SAXTON a/ka JOHN GARON SAXTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/01/2023 |
| TRIAL JUDGE: | HON. M. BRADLEY MILLS |
| TRIAL COURT ATTORNEYS: | RICK D. PATT |
| | WESLEY THOMAS EVANS |
| | ASHLEY RIDDLE ALLEN |
| | JOHN K. BRAMLETT, JR. |
| | KATIE NICOLE MOULDS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/09/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     John Garon Saxton was convicted of aggravated assault following a jury trial in the

Madison County Circuit Court for hitting his father-in-law, Toby Melton, in the head with

a metal bat.  John appeals, claiming that the trial court erred by granting two jury instructions

submitted by the State and by denying a jury instruction submitted by the defense. We find no reversible error with the trial court's rulings. We affirm.

**FACTS**

¶2. John was married to Toby's daughter Whitney Saxton when the incident occurred on August 24, 2021. Whitney's mother, Vickie Melton, had gone to John and Whitney's house to help clean and watch their children. Whitney had recently undergone an appendectomy, and John had recently undergone shoulder surgery, and his left arm was in a sling. Toby, who was in his early sixties at the time, was planning to come over and cut their grass when he got off from work.

¶3. Before Toby arrived, Vickie and John got into an altercation over John disciplining his five-year-old son for not picking his toys up from the yard. John admitted slapping Vickie after she pushed him near his injured shoulder. Vickie denied pushing John and said that she pointed her finger at him and barely touched him.

¶4. Conflicting evidence also was presented as to what happened next. Vickie said she went inside the house and called Toby, telling him he needed to hurry up and get there. She did not tell Toby what had happened. Both Whitney and Toby also testified that Vickie did not tell Toby on the phone that John had just slapped her.

¶5. John testified that he heard Vickie tell Toby over the phone: "The son of a bitch slapped me." (Internal quotation marks omitted.) John said that while Vickie was on the phone with Toby, he (John) yelled out, so Toby could hear him: "Your wife's done . . . crossed the line as far as me disciplining my kids. Come on over. Let's talk about it."

2

¶6.    According to Toby, when he arrived at their house, he parked his car in front of the driveway. As soon as he got out of the car, John walked down the driveway toward him and said, "Hey, dad'o" because "that's what my "grandkids call me." Toby thought everything was "cool" at that point. But John then leaned into him and said, "[y]ou might want to check on your wife. I just slapped the sh*t out of her big fat a**." Toby said John was "right [up] on me" when he said that, and "I was shocked" at what John had just said. Toby said to John, "[g]et off of me." Toby then did "just a brushback to get [John] off because he was right there on me when he said it and I guess maybe my adrenaline was flowing to know that he had slapped my wife."

¶7.    Toby testified that about "three or four seconds" later, he saw John standing on the other side of one of the other cars in the driveway. John pulled out a gun, pointed it at him (Toby), and said that "he was just going to kill my a**...." Toby said, "I was, like - - well, I guess he - - if you're going to do it, I guess, you know, if you're going to do it - - I didn't know what to say, you know."

¶8.    Toby remembered "hearing Whitney screaming at me, [c]ome get in the house." She said "we got to get our kids in the house." Toby said he "turned and looked at them all sitting there watching this thing and then I - - I turned and I said, Okay." Toby remembered turning from John and walking towards the house. Whitney was in front of him (Toby), and John remained behind him.

¶9.    When Toby reached the steps to the front porch of the house and began to proceed up the steps he "heard a loud aluminum bat when it makes that little tingling sound when it hits

3

and then - - and then I remember when it hit me I just went down and that's all I remember." Toby said he never saw it coming, "I just . . . remember hearing that distinctive sound with the aluminum bat." Toby said that he suffered a fractured skull, a concussion, and a broken collar bone.

¶10.    Whitney testified that before her father arrived, she kept telling John to leave the house. But John "was very determined to tell my dad exactly what happened." When Toby arrived at the house and was walking up the driveway toward the house, John sprinted out to him saying, "You need to get your fat a** wife. I just slapped the b**** because she came at me."

¶11.    Whitney said that at that point, "it looked like [Toby] was trying to lunge" at John, but Toby has "had knee replacements[,] so it's not like a lunge, I don't know what you'd call it, he was walking up the hill, and lunged and had his hand out." She said that John then backed up, "and he went towards my van." Whitney said Toby continued to walk up the driveway.

¶12.    Whitney said that while Toby was checking on her (Whitney), John ran around her van to his car and pulled out a gun. She said that Toby then told her to get inside the house, and the two of them began walking toward the house. She said Toby appeared calm at this point. When they reached the steps to the front porch, Toby had his hand on her back pushing her up the steps. Whitney said that when she turned around, "I saw a bat coming and I yelled, Oh, my God." She said Toby "turned this way and put his arms up and that's when he got hit in the head with the bat." Toby fell flat on his back, and his eyes were closed. Vickie immediately went to Toby and began rendering aid to him. Whitney then called 911.

4

¶13. Whitney said that while Toby was lying on the ground, John began taunting Toby, saying, "You're not so big and bad now, are you, mother f*****[.]" She said John "taunted him on and off and he would get up and walk around and see what I was doing and then he'd go back and taunt him again."

¶14. John testified that when Toby pulled up to the house and got out of the car, he began walking down the driveway toward Toby, telling him that "you need to get your wife and get out of here[.]" Toby then said, "I'm going to kill you." The two of them met in the middle of the driveway, and Toby punched John "three our [sic] four times." John said that "I just tucked my head and ate "em." John said that Toby mostly hit him "[u]pside the head, on the top of it[.]" He said that Toby is "6'4", 6'5", 320 [lbs.,]" whereas he (John) is "5'11" and weighs "a buck-60 soaking wet."

¶15. John said he "drew away to get away from" Toby. John admitted that he went to his car and got his gun, but he did not take it out of the holster. He only put it on top of the car, and he never pointed it at Toby. John told Toby, "If you take another step towards me, I'm gone put a hole in you're a**." (Internal quotation marks omitted.) John said that Toby then "threw his hands up and went to backing up."

¶16. John said that stopped Toby from coming at him, and he no longer felt threatened by Toby at that moment. John then put the gun back into the car. John walked around the car and proceeded toward the open garage to go inside the house. As he did so, Toby then began "coming at me again[.]" John said he made it to the garage and the first thing he saw was a bat leaning against the golf cart inside the garage. Toby was still "coming at me huffing

5

and puffing." John said he feared for his life or bodily harm from Toby, so John grabbed the bat, "and I wrapped him." John said Toby "was looking dead at me in the eyes" when he hit Toby with the bat.

¶17. John admitted that when Toby was lying on the ground, he may have "said some things" to Toby, though he could not remember what all he said. He did remember saying, "I told you to get your wife and y'all get out of here. None of this would have happened if she wouldn't have been trying to, you know, overstep her boundaries as far as me just disciplining my children."

¶18. The jury found John guilty of aggravated assault. John appeals, claiming that the trial court erred by granting two jury instructions submitted by the State (S-4 and S-7) and by denying a jury instruction submitted by the defense (D-3).

## DISCUSSION

¶19. When considering whether the trial court erred by granting or denying a jury instruction, this Court reviews all of the instructions "as a whole to determine if the jury was properly instructed." *Smith v. State*, 835 So. 2d 927, 934 (Miss. 2002) (quoting *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001)). "[D]efects in specific instructions will not mandate reversal when all of the instructions, taken as a whole fairly—although not perfectly—announce the applicable primary rules of law." *Boyd v. State*, 47 So. 3d 121, 124 (Miss. 2010) (internal quotation marks omitted) (quoting *Utz v. Running & Rolling Trucking, Inc.*, 32 So. 3d 450, 474 (Miss. 2010)). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* (alteration in

6

original) (internal quotation marks omitted) (quoting **Harris v. State**, 861 So. 2d 1003, 1014 (Miss. 2003)).

## Jury Instructions S-4 and S-7

¶20.    Both S-4 and S-7 were given by the trial court without objection from the defense as to either instruction submitted as written.  Accordingly, John is procedurally barred from complaining about either instruction on appeal unless he can demonstrate plain error.  **Spiers v. State**, 361 So. 3d 643, 657 (Miss. 2023).  John fails to do so.

¶21.    Jury instruction S-4 reads:

> The [c]ourt instructs the jury that the law in Mississippi declares that an aggressor is not entitled to assert the defense of self-defense.  This means that if you find from the evidence in this case beyond a reasonable doubt that JOHN SAXTON was the initial aggressor in this confrontation with Toby Melton, then JOHN SAXTON may not claim he acted in self-defense.[1]

¶22.    John contends that this instruction is the same as a pre-arming jury instruction, which this Court abolished in **Taylor v. State**, 287 So. 3d 202 (Miss. 2020).  He argues that while S-4 contains different language than the typical pre-arming instructions often condemned by

---

[1]  The initial version of this instruction submitted  by the State, read:

> The [c]ourt instructs the jury that the law in Mississippi declares that an aggressor is not entitled to assert the defense of self-defense.  This means that if you find from the evidence in this case beyond a reasonable doubt that JOHN SAXTON was the initial aggressor in this event, then JOHN SAXTON may not claim he acted in self-defense.

Defense counsel did not object to the legal standard of this instruction.  Rather, he voiced concern with the term "event," saying "it could confuse the jury" because they "might think that we can go back to the incident between Mr. Saxton and the mother-in-law." Defense counsel suggested that it be changed to "confrontation with Toby Melton[.]"  The State agreed to this change.

this Court, it nonetheless operates as a self-defense estoppel instruction. This is because it fails to inform the jury that "where the accused, acting in good faith, attempts to withdraw from the encounter and abandons his original purpose and intent, . . . the accused would not be deprived of the right to assert self-defense even though it became necessary thereafter to slay his adversary." **Patrick v. State**, 285 So. 2d 165, 168 (Miss. 1973) (citing **Jones v. State**, 84 Miss. 194, 36 So. 243 (1904)).

¶23. We agree that S-4 is an estoppel instruction that does not provide a full and adequate statement of Mississippi law regarding self-defense. Like the so-called pre-arming instructions abolished by this Court in **Taylor**, this instruction fails to include "any consideration of the doctrine of locus poenitentiae[.]"[2] **Taylor**, 287 So. 3d at 206 (alteration in original) (internal quotation marks omitted) (quoting **Pulpus v. State**, 82 Miss. 548, 34 So. 2, 3 (1903)).

¶24. The Court of Appeals addressed an identical instruction in **Hampton v. State**, 910 So. 2d 651 (Miss. Ct. App. 2005). There, defense counsel had objected to the instruction offered by the State, citing a general self-defense instruction proposed by the defense, which informed the jury what is required "to make an assault justifiable on the grounds of self-

---

[2] "['A] chance afforded to a person, by the circumstances, of relinquishing the intention which he has formed to commit a crime, before the perpetration thereof.' *Locus poenitentiae*[,] Black's Law Dictionary (4th ed. 1968))." **Taylor**, 287 So. 3d at 206 n.2 (first alteration in original).

defense[.]"[3] *Id.* at 656-57. Despite defense counsel's objection, the trial court granted both the State's instruction and the defense's instruction. *Id.* at 657.

¶25. On appeal, the defendant claimed that "the trial court erred in granting a jury instruction stating that an aggressor is not entitled to self-defense[.]" *Id.* at 653. The Court of Appeals first noted that the defense offered no further objection after the trial court granted "the State's instruction as well as Hampton's self-defense instruction." *Id.* at 659. The Court of Appeals then concluded that "Hampton's objection was cured by granting his self-defense instruction." *Id.*

¶26. This Court recently saw a similar instruction to S-4 in *Turner v. State*, 319 So. 3d 1066 (Miss. 2021). In addressing a sufficiency-of-the-evidence claim as to the defendant's aggravated assault conviction, this Court noted in passing that a self-defense instruction granted by the trial court that contained, *inter alia*, the following: "An aggressor is not entitled to assert the defense of self-defense. As to any count, if you find that [the defendant] was the initial aggressor in the series of events, then [the defendant] may not claim that he acted in self defense." *Id.* at 1073.

---

[3] The general self-defense instruction submitted by the defense in *Hampton* provided as follows:

> The Court instructs the jury that to make an assault justifiable on the grounds of self-defense, the danger to the Defendant must be either actual, present and urgent, or the Defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the Defendant acts.

*Hampton*, 910 So. 2d at 657.

¶27. But unlike in *Hampton*, and in the instant case before us, the defendant in *Turner* did not challenge on appeal any of the jury instructions submitted at trial. John does so here, and, as mentioned, because he did not properly object at trial to the legal propriety of instruction S-4, he must rely on plain error to raise the assignment of error on appeal. *Perkins v. State*, 863 So. 2d 47, 55 (Miss. 2003). "The plain error doctrine has a two-part test which requires: (i) an error at the trial level and (ii) such error resulted in a manifest miscarriage of justice." *Stephens v. State*, 911 So. 2d 424, 432 (Miss. 2005) (citing *Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989)).

¶28. We hold now that jury instruction S-4, by itself, constitutes error in cases in which the underlying facts of the case give rise to a viable self-defense claim. While instruction S-4 is not necessarily an incorrect statement of Mississippi law, it is an incomplete statement of Mississippi law that can be used to misinform and mislead the jury.

¶29. That said, we find that any error that occurred by giving instruction S-4 in this case did not result in a manifest miscarriage of justice. On appeal, John points to a line of cases in which this Court condemned estoppel instructions with regard to the law of self-defense in Mississippi. On the facts of the case, however, John simply asserts as follows: "[John] testified that after he displayed the gun and Toby stopped pursuing him, [John] decided that he did not want to hurt anybody and he tried to get himself inside, but Toby thereafter came at him again prompting him to grab the bat to defend himself." That sentence is all that John puts forward on appeal, ostensibly asserting that instruction S-4 resulted in a manifest miscarriage of justice.

¶30. As the record shows, John's entire defense at trial was that he feared serious bodily harm from Toby due to Toby's size. This Court has held that "where an attacker is much larger than the one attacked, the nature of the assault, though only with fists, might be such as to reasonably show that the one being attacked is in danger of great bodily harm, and therefore is justified in the use of a deadly weapon to defend [himself]." *Manuel v. State*, 667 So. 2d 590, 592 (Miss. 1995) (citing *Hinson v. State*, 218 So. 2d 36, 39 (Miss. 1968)).

¶31. In *Marshall v. State*, 220 Miss. 846, 72 So. 2d 169, 172 (1954), the defendant sought to have the jury instructed on this type of self-defense claim in a manslaughter case. But the trial court denied the instruction, essentially cutting off the defendant's theory of self-defense. *Id.* at 172. Finding no reversible error, this Court held as follows:

> There is no proof in the record to show that the deceased at the time of the fatal encounter was attempting to inflict 'great and serious bodily harm upon the defendant with his hands and feet.' The defendant testified that at the time he stabbed the deceased the deceased was advancing on him with a shovel. The defendant testified more than once that he was afraid of the deceased. But the mere fact that the deceased may have been 'physically capable of inflicting great and serious bodily harm upon the defendant with his feet and hands,' and that the defendant was afraid of the deceased, was not sufficient in itself to justify the stabbing.

*Id.* The *Marshall* Court so found despite evidence presented in the case that the deceased had been "beat[ing]" on and "knock[ing]" down the defendant "all day long," and "threatened to whip the [defendant] every time he saw him." *Id.* at 170.

¶32. Notably, in both *Hinson* and *Manuel*, in which this Court agreed with the applicability of this type of self-defense claim on the facts of the case, there was evidence of physical violence taking place at the time of the fatal encounters. *See Hinson*, 218 So. 2d

11

at 38 (testimony that the deceased was on top of the defendant "severely beat[ing]" the defendant when he shot him); ***Manuel***, 667 So. 2d at 591 (testimony that the deceased was continuously hitting the defendant in her face and chest when she stabbed him).

¶33.   Here, as was the case in ***Marshall***, there was no physical violence taking place at the moment John hit Toby in the head with the bat.  ***Marshall***, 72 So. 2d at 172.  John testified that when he pulled out the gun and Toby threw his hands up and backed away, John no longer felt threatened by Toby.  John said at that moment, he (John) just wanted to get "[his] butt back inside the house."  John said that Toby, Vickie, and Whitney were then all on the porch "yip-yapping and talking[.]"  As John walked toward the garage, Toby came down the steps from the porch and began "walking towards [John]."  John said Toby was huffing and puffing, and John could tell by Toby's eyes, that Toby "was hot," mad.  John said he thought Toby "was fixing to hurt [him]."  And because he "couldn't fight back," due to his "collarbone[,]" John said he grabbed the bat and "swung [it] just over the top of my head to [Toby's] head."

¶34.   As was the case in ***Marshall***, even if Toby may have been "physically capable of inflicting great and serious bodily harm upon the defendant with his feet and hands," and even if John was afraid of Toby, this was not sufficient in itself to justify John's hitting Toby in the head with the bat.  ***Id.*** (internal quotation marks omitted).

¶35.   Further, unlike in ***Marshall***, the trial court granted John a self-defense instruction similar to the one denied by the trial court in ***Marshall***.  ***Id.***  Denoted as D-2, the instruction read:

12

> If you believe from the evidence that Toby Duane Melton was a much larger and stronger person than the Defendant, and was capable of inflicting great and serious bodily harm upon the Defendant with his bare hands, and the Defendant had reason to believe as a person of ordinary reason that he was then and there in danger of such harm at the hands of Toby Melton, and the Defendant used an aluminum bat with which he struck Toby Melton, to protect himself from such harm, the Defendant was justified, and your verdict shall be "NOT GUILTY", even though Toby Melton may not have been armed.

¶36. We find that instruction D-2 cleared up any confusion that instruction S-4 might possibly have engendered. With the language that John "was then and there in danger of [great and serious bodily harm] at the hands of Toby Melton," instruction D-2 directed the jury to consider the facts and circumstances at the moment John struck Toby with the bat.

¶37. Who started what in the backyard that led to the difficulty between John and Toby or who was the initial aggressor in the driveway when Toby first arrived at the house was wholly immaterial as to the moment with the bat. And any instruction "mak[ing] . . . reference as to who was the aggressor" was "[i]n a case of this character . . . wholly unnecessary." *Lewis v. State*, 188 Miss. 410, 195 So. 325, 326 (1940) (finding that based on the evidence, the defendant "was cut off from the right of self-defense").

¶38. While we agree with John that the State should not have submitted instruction S-4, we do not find that it resulted in a manifest miscarriage of justice. This is particularly so given that John was granted instruction D-2; by comparison, the defendant in *Marshall* was denied a similar instruction under similar facts and circumstances. *Marshall*, 72 So. 2d at 172. Accordingly, we find no reversible error with regard to jury instruction S-4.

¶39. Jury instruction S-7 read:

13

Imminent danger is defined as an immediate threat to one's safety that justifies the use of force in self-defense. Further, immediate is defined as occurring without delay or instant. There must be an overt act at the time of the incident to justify a claim of self defense.

¶40. John claims that because the word *imminent* does not appear in any other instructions, instruction S-7 is rendered confusing and misleading. Further, according to John, instruction S-7 improperly precluded John's claim of self-defense because under Mississippi law, John "had the right to anticipate an attack and to act upon reasonable appearances." He cites *Lee v. State*, 232 Miss. 717, 100 So. 2d 358, 361 (1958), for support.

¶41. Instruction S-7 is a definitional instruction, which the Court of Appeals recently recognized is not a misstatement of Mississippi law. *Johnson v. State*, 347 So. 3d 192, 196-97 (Miss. Ct. App. 2021)). In construing an almost identical instruction, the Court of Appeals rejected the claim "that this instruction 'purports to define' imminent danger but inaccurately states the law by including 'the additional problematic component' of an overt act." *Id.* at 196.

> This argument fails in light of recent authority from the Mississippi Supreme Court. *See Wells v. State*, 233 So. 3d 279 (Miss. 2017). In *Wells*, the Court quoted Black's Law Dictionary in defining imminent danger as "an immediate threat to one's safety that justifies the use of force in self-defense—The danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself." *Id.* at 285 (¶ 12). The Court further explained that "immediate" means "occurring without delay; instant." *Id.* Most relevant to Johnson's case, it clarified that "[a]dditionally, our caselaw provides that there must be an overt act *at the time* of the incident to justify a claim of self defense." *Id.* (emphasis in original).

*Johnson*, 347 So. 3d at 196.

14

¶42. The Court of Appeals also rejected the claim that **Wells** was inapplicable since **Wells** was not reviewing a jury instruction but rather was reviewing whether the evidence in the case supported a self-defense claim. **Johnson**, 347 So. 3d at 197.

> While it is true that **Wells** did not concern an instruction defining imminent danger, it *did* discuss at length the concept of imminent danger as an element of self-defense. **Id.** More specifically, the **Wells** Court surveyed a century and a half of law in holding that "there must be an overt act *at the time* of the incident to justify a claim of self defense." **Id.** (emphasis in original).

**Johnson**, 347 So. 3d at 197 (quoting **Wells**, 233 So. 3d 279).

¶43. Here, as the Court of Appeals concluded in **Johnson**, instruction S-7 accurately stated the law. And as to John's contention that instruction S-7 deprived him of the notion that he could defend himself against danger reasonably apparent, instruction D-2 carried this idea to the jury, with the following language: "[if] the Defendant had reason to believe and did believe as a person of ordinary reason that he was then and there in danger of such harm at the hands of Toby Melton[.]" The phrase "reason to believe" connotes the same thing as apparent or appearance.

¶44. Accordingly, we find no reversible error with regard to jury instruction S-7.

### Jury Instruction D-3

¶45. Jury instruction D-3 read:

> In order for JOHN GARAN SAXTON to have acted in self-defense, he must have believed that he was in actual danger or reasonably believed that Toby Melton intended to cause great bodily harm to him, and that JOHN GARAN SAXTON reasonably believed that Toby Melton was about to carry out these actions against him.
>
> It is up to the jury to determine the reasonableness of the ground upon which the Defendant acted.

15

JOHN GARAN SAXTON does not have to prove that [he] acted in self-defense. The State has the burden of proving beyond a reasonable doubt that he did not act in self-defense. If you find that the State did not prove beyond a reasonable doubt that JOHN GARAN SAXTON did not act in self-defense, then you shall find him NOT GUILTY of Aggravated Assault.

¶46. John contends that this type of instruction is commonplace in trials in which self-defense is raised, and it properly instructs the jury that they must acquit if they find that the defendant acted in self-defense. Without mentioning instruction D-2, John claims that the trial court's refusal to allow instruction D-3 left the jury inadequately instructed on John's only defense theory.

¶47. According to the record, the trial court denied instruction D-3 because it was repetitive with instruction D-2. We agree.

¶48. "A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which . . . is fairly covered elsewhere in the instructions, or is without foundation in the evidence." *Lee v. State*, 858 So. 2d 124, 128 (Miss. 2003) (alteration in original) (internal quotation marks omitted) (quoting *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998)).

¶49. Again, John's entire defense at trial was that he hit Toby in the head with the bat because John believed that he was in danger of serious bodily harm at the hands of Toby, who was much larger than he. Instruction D-2 conveyed this self-defense claim to the jury. Instruction D-2 also provided to the jury everything that instruction D-3 would have provided with the exception of informing the jury that the State has the burden of proving the defendant did not act in self-defense. That though was provided by jury instruction S-1B,

16

the State's elements instruction, which informed the jury that the State must prove that John did not act "in necessary self defense."

¶50. Accordingly, we find no merit to John's claim that the trial court erred by denying instruction D-3.

## CONCLUSION

¶51. The judgment of the Madison County Circuit Court convicting John Garon Saxton of aggravated assault is affirmed.

¶52. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., COLEMAN AND CHAMBERLIN, JJ. KITCHENS, P.J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J.; COLEMAN, J., JOINS IN PART.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶53. Because the jury was ultimately instructed on John Saxton's self-defense theory, I agree with the majority that no reversible error occurred.

¶54. But to be clear, instruction S-4 should not have been given. As the majority acknowledges, in 2020, this Court abolished "the 'exceedingly unwise,' 'dangerous,' and 'strongly criticized' practice of impinging self-defense claims" through pre-arming instructions. *Taylor v. State*, 287 So. 3d 202, 208 (Miss. 2020) (footnotes omitted) (quoting *Lofton v. State*, 79 Miss. 723, 31 So. 420, 421 (1902); *Dew v. State*, 748 So. 2d 751, 754 (Miss. 1999)). While the majority concedes that S-4 is like the now-abolished pre-arming instruction, I contend that S-4 is actually *worse* than an a pre-arming instruction.

17

¶55. In a typical pre-arming instruction, the jury is instructed that "if a person provokes a difficulty, arming himself in advance, and intending, if necessary, to use his weapon and overcome his adversary, he becomes the aggressor and cannot claim the right of self-defense." *Boston v. State*, 234 So. 3d 1231, 1234 (Miss. 2017). But here, instruction S-4 did not even explain that a person "becomes the aggressor" if he "provokes a difficulty, arming himself in advance, and intending, if necessary, to use his weapon and overcome his adversary . . . ." *Anderson v. State*, 571 So. 2d 961, 963 (Miss. 1990). To be sure, this explanatory language was never helpful and ended up cutting off many legitimate self-defense claims—that is why the instruction was abolished. *Taylor*, 287 So. 3d at 209. Because "[t]here is no legitimate rationale to continue estopping self-defense claims by giving pre-arming instructions," there is no legitimate reason to estop self-defense claims by simply labeling the defendant "an aggressor." *Id.* at 208.

¶56. As we explained in *Taylor*, juries should be "trusted to find any defendant guilty whose case is really so bad as to estop him to plead self-defense[.]" *Id.* (emphasis omitted) (quoting *Lofton*, 31 So. at 421). So instead of concerning themselves with whether a defendant's actions somehow prevent him from claiming self defense, "trial[] judges should simply instruct the jury on self-defense when the evidence supports it." *Id.* That way the jury can consider the defense "and let the chips fall where they may." *Id.* at 209.

¶57. Because John was not stopped from arguing self-defense and the jury was instructed on his self-defense theory—and because John failed to object to instruction S-4—I agree the instructional error was not reversible. But I would caution trial courts to stop giving estoppel

18

instructions and instead simply focus on whether an evidentiary foundation exists to give a requested self-defense instruction.

**KITCHENS, P.J., COLEMAN AND CHAMBERLIN, JJ., JOIN THIS OPINION.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶58.   I concur with the majority that the trial court's grant of jury instructions S-4 and S-7 does not warrant reversal of the conviction on review for plain error. I write separately to explain my view that instruction S-7 contains an abstract expression of the law regarding "overt act" and therefore had the potential to confuse or mislead the jury. Jury instruction S-7 stated:

> Imminent danger is defined as an immediate threat to one's safety that justifies the use of force in self-defense. Further, immediate is defined as occurring without delay or instant. There must be an overt act at the time of the incident to justify a claim of self defense.

¶59.   "If an instruction merely relates a principle of law without relating it to an issue in the case, it is an abstract instruction and should not be given by the Court." *Freeze v. Taylor*, 257 So. 2d 509, 511 (Miss. 1972) (citing *New Orleans, Jackson, & Gr. N. R.R. v. Statham*, 42 Miss. 607 (1869). "We have repeatedly warned the attorneys against copying sentences from opinions of the Court into instructions." *Id.* Abstract instructions are "dangerous, because, although such instructions may be correct in principle, they require legal training to properly interpret." *Id.*

¶60.   In 2017, this Court unanimously held in *Wells v. State* that—on the facts of that case—the trial court properly denied a defendant's request that the jury be instructed on a

19

theory of self-defense. ***Wells v. State***, 233 So. 3d 279, 285-86 (Miss. 2017). Following a thorough analysis of the course of events leading to the shooting, we held that "[t]here was no overt act at the time Wells shot [the victim] that could indicate danger of death or great bodily harm at the moment." ***Wells***, 233 So. 3d at 286.

¶61.    This abstract statement of the law from ***Wells*** should not have been copied and pasted into a jury instruction that was meant to define imminent danger because doing so had a high potential to confuse and mislead the jury. In a justifiable killing,[4] the perceived imminent danger does not have to be actual, but can be real or apparent. ***Scott v. State***, 34 So. 2d 718, 719 (Miss. 1948). "'Apparent danger' . . . means such overt demonstration, by conduct and acts, of a design to take life or do some great personal injury, as would make the killing reasonably apparent[] necessary to self-preservation or to escape great bodily harm." ***Id.*** (quoting ***Evans v. State***, 44 Miss. 762 (1870), *overruled on other grounds by **Flowers v. State***, 473 So. 2d 164 (Miss. 1985)).

¶62.    A single overt act is not a statutory requirement for self-defense under Section 97-3-15(1)(f). But we long have held that an "overt act" or "overt demonstration" is an inherent part of a general self-defense analysis and that a defendant is not entitled to present evidence of self-defense without "any act which could be construed as a demonstration towards violence . . . ." ***Holly v. State***, 55 Miss. 424, 429 (1877). We also have held that "no exact definition of an overt act can be given, and that the term embraces anything which evinces

---

[4]*See* Miss. Code Ann. § 97-3-15(1)(f) (Rev. 2020).

20

a present design to make an assault." *Id.* at 430. Ultimately, "what is an overt act, should be determined, from the circumstances of each case, by the jury." *Id.* at 426.

¶63. Here, abstractly tacking "[t]here must be an overt act at the time of the incident to justify a claim of self[-]defense" to the end of the definition of imminent danger in jury instruction S-7 omits the broader principle articulated in *Holly* and similar cases that an overt act includes "anything which evinces a present danger to make an assault." *Id.* at 431. Presented in the abstract, the instruction could create confusion over whether one overt act is an additional independent requirement to the real or apparent imminent danger analysis, and it could mislead the jury into the impression that the danger must be real and not merely apparent. In short, this is a poor jury instruction that is not supported by *Wells*.

¶64. In *Freeze*, we found that the defendant in a car wreck case was erroneously granted the following instruction, which, even though a correct statement of law, was "abstract in form": "[t]he Court instructs the jury for the defendant that liability rests not upon danger but upon negligence." 257 So. 2d at 511. We identified the opinion this language was "obviously taken from" and cautioned that "[w]e have repeatedly warned the attorneys against copying sentences from opinions of the Court into instructions." Similarly, in *Wall v. State*, 379 So. 2d 529, 532 (Miss. 1980) (internal quotation marks omitted), this Court reversed and remanded a murder conviction for a new trial when the jury was instructed: "[t]The Court instructs the jury that under the laws of the state of Mississippi, proof of motive is not essential to a conviction for felonious homicide." We held that:

> Motive is not required to be shown in order for a conviction of crime to be upheld. However, the above instruction is an abstract instruction on the law

21

and should not be given. The instruction . . . well could have confused the jury into returning a guilty verdict after having been told by the court that motive was not required to be shown. There was no motive indicated in the case.

*Id.* at 532 (citation omitted).

¶65.    "The test to determine whether or not an instruction is abstract is to determine whether or not the instruction relates to facts shown by the evidence on the issues involved in the case." ***Freeze***, 257 So. 2d at 511. Here, left to visualize abstractly a single overt act, the jury could be misled into applying the concept narrowly instead of broadly. Additionally, the separation of the overt act reference from the instruction on real or apparent danger has the potential to create confusion that a singular overt act is an additional, independent requirement rather than a nuanced component of the apparent imminent danger analysis.[5]

¶66.    Here, Saxton did not object to this jury instruction at trial. On plain error review, I agree with the majority that the grant of the instruction is not reversible error. But, consistent with our position in ***Freeze***, I would strongly caution against the crafting of jury instructions that are created by copying abstract statements of law from appellate decisions.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION. COLEMAN, J., JOINS THIS OPINION IN PART.**

---

[5] We rejected, eight-to-one, the argument that an indictment for attempted burglary must contain a separate explicit allegation of an overt act done in furtherance of the attempt. ***Brady v. State***, 337 So. 3d 218 (Miss. 2022).